# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

UNITED STATES OF AMERICA

v.

FAYSAL KALAYAF MANAHE,
YASER AALI,
AMMAR ALKINANI, and
QUASIM SAESAH

　　　　　　　　　　Defendants.

No. 2:22-cr-00013-JAW

## UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE INDICTMENT

Defendants Faysal Kalayaf Manahe, Yaser Aali, Ammar Alkinani, and Quasim Saesah (Defendants) are charged in a one-count indictment with violating Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix the wages of personal support specialist (PSS) workers and to allocate PSS workers. ECF No. 1. The former is price fixing. The latter is market allocation. Both are *per se* unlawful under decades of Supreme Court and First Circuit precedent, regardless of the industry and regardless of whether the conspirators are sellers, buyers, or employers. S*ee* Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶2012c (5th ed. 2021) ("A naked agreement among employers limiting salaries or wages, such as an 'anti-poaching' agreement, is unlawful per se.").

Defendants move to dismiss the Indictment (Def. Mot.). ECF No. 79. Their motion is premised on mischaracterizations of the Indictment and misconstructions of the law. *Id.* Further, in substantial part, Defendants' motion is based on extrinsic evidence, Def. Mot. 17-21, which the Court cannot consider when determining the sufficiency of an indictment. *See United States v. Young*, 694 F. Supp. 2d 25, 26–27 (D. Me. 2010); *United States v. Levesque*, 681 F.2d 75, 78 (1st Cir.1982). Defendants' motion to dismiss should be denied.

## THE CHARGED CONSPIRACY

The Indictment charges Defendants with committing a *per se* unlawful offense under 15 U.S.C. § 1 by entering into a conspiracy to fix the wages of their employees and to not hire one another's employees. Indictment ¶15. The conspiracy was formed and effectuated by Defendants, each of whom is an owner or manager of a home healthcare agency that employs PSS workers in the Portland, Maine area. *Id.* ¶¶5-8, 12, 15, 16.

The goal of Defendants' conspiracy was simple: to eliminate competition for PSS workers. *Id.* ¶15. Defendants sought to accomplish this by conspiring to fix the rates their agencies paid to these workers and by agreeing not to hire each other's PSS workers. *Id.* ¶16. For example, the Indictment alleges that, between April 7 and April 9, 2020, Defendants sent text messages to one another explicitly describing the wage-fixing part of their conspiracy:

- Saesah: "Brothers, everyone has agreed that the rate is from 15-16"
- Aali: "[W]e have agreed on 15 and 16 and I started announcing it."
- Alkinani: "I am committed and told the employees 15-16"
- Kalayaf: "Yes, this is the agreement [. . .] I am still going with 15 and 16."

*Id.* ¶17(d). The indictment also alleges that Defendants "engaged in discussions regarding . . . refraining from hiring each other's PSS workers." *Id.* ¶17(b).

To further their conspiracy, Defendants agreed to pressure competing employers to retract their own wage increases. *Id.* ¶17(e). For example, on April 6, 2020, Defendant Aali called the owner of an agency competing for PSS workers, asked him to retract his PSS wage increase, and threatened to submit complaints to the state about him if he did not comply. *Id.* Then, between April 7 and 13, 2020, Defendants Alkinani and Saesah, and Individual 1, on behalf of Defendant Kalayaf's agency, contacted the state to urge an investigation of the competing agency. *Id.*

Defendants also tried to further their conspiracy and eliminate competition by attempting to recruit additional competing agencies to join the conspiracy. *Id.* ¶¶17(f), (g). For example, on

April 26, 2020, weeks after Defendants formed the conspiracy, they invited a competitor PSS agency to join the conspiracy and proposed several terms to the agency.[1] *Id.*

## **LEGAL STANDARD**

Indictments must provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). For purposes of a motion to dismiss an indictment, "a court must accept the allegations in the indictment as true." *Young,* 694 F. Supp. 2d at 27 (citing *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n. 16 (1952)). Because "[t]raditional civil motion practice is not generally available in criminal law," the court also cannot consider facts not contained in the indictment. *Young*, 694 F. Supp. 2d at 27; *see Levesque*, 681 F.2d at 78. Further, "[a] court should exercise its authority to dismiss cautiously, since to dismiss an indictment 'directly encroaches upon the fundamental role of the grand jury.'" *United States v. Thomas*, 519 F. Supp. 2d 141, 143–44 (D. Me. 2007) (quoting *Whitehouse v. U.S. Dist. Ct.*, 53 F.3d 1349, 1360 (1st Cir. 1995)).

To the extent that Defendants' arguments invoke facts or conjecture regarding what evidence may be presented at trial, such arguments are improper. A Rule 12(b) motion alleging a defect in an indictment does not "provide[ ] an occasion to force the government to defend the sufficiency of its evidence to be marshalled in support of proving the charged offense." *United*

---

[1] Defendants misleadingly assert that the charged conspiracy is entirely embodied in subparagraphs 17(f) and (g) of the Indictment. Def. Mot. at 17-21, 26. Such assertions, made not only in their motion to dismiss but in their accompanying motion for a bill of particulars (ECF No. 65) and their motion for a coconspirator hearing (ECF No. 66), mischaracterize the charged conspiracy. Subparagraphs 17(f) and (g) allege, as "Means and Methods of the Conspiracy," that Defendants held an in-person meeting with a competitor after the conspiracy was already formed, in an effort to "persuade them to join the agreement," that Defendants "proposed several terms" to a competitor, and that they "invited" that competitor to join the conspiracy. Indictment ¶17(f), (g). Defendants fixation on these discussions, of course, conveniently ignores the remaining allegations in the Indictment, including the allegations in subparagraph 17(d) that Defendants sent text messages acknowledging their participation in the conspiracy, weeks before the episodes described in subparagraphs 17(f) and (g). Nothing in the Indictment alleges that the conspiracy was formed in the episodes emphasized by Defendants.

*States v. Rodríguez-Rivera*, 918 F.3d 32, 35 (1st Cir. 2019). Indeed, "a court must deny a motion to dismiss if the motion relies on disputed facts." *United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018) (internal marks and citations omitted). Likewise, Defendants' suggestion (at 15 n.7), without authority, that it would be more efficient for this Court to dismiss this matter pretrial to trigger an appeal to the First Circuit, should be rejected—this Court is well-equipped to interpret and apply the law.

## ARGUMENT

The Indictment charges Defendants with violating Section 1 of the Sherman Act by conspiring "to suppress and eliminate competition for the services of PSS workers by agreeing to fix the rates paid to PSS workers and by agreeing not to hire each other's PSS workers." Indictment ¶15. Such conduct is a *per se* violation of the Sherman Act, 15 U.S.C. § 1.

### I.  The Indictment properly alleges a *per se* violation of Section 1 of the Sherman Act.

To charge a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, an indictment must allege that the defendant knowingly entered into an unreasonable restraint of interstate trade. Restraints of trade are either "vertical" or "horizontal." Vertical restraints are agreements between firms operating at different market levels (e.g., manufacturers and retailers). *See Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 894 (2007). Horizontal restraints are agreements between firms at the same market level (e.g., rival manufacturers competing for sales or rival employers competing for labor). *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 166-70 (1940); *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235-36 (1948) (buyer cartel); *Anderson v. Shipowners' Ass'n*, 272 U.S. 359, 361-65 (1926) (employer cartel).

Restraints of trade can be unreasonable under one of two standards. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018). The first is a fact-intensive analysis of competitive impact

under the rule of reason. *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2151 (2021). The second is the *per se* rule, which recognizes that Congress condemned certain categories of restraints based on their inherently anticompetitive "nature and character." *Standard Oil Co. v. United States*, 221 U.S. 1, 64-65 (1911); *see United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991) ("[C]ase-by-case analysis is unnecessary when the restraint falls into a category of agreements which have been determined to be per se illegal.").

The *per se* rule typically applies to horizontal restraints, such as price fixing, bid rigging, and market allocation. *White v. R.M. Packer Co.*, 635 F.3d 571, 575 (1st Cir. 2011) ("[A]greements to fix prices are 'so plainly anticompetitive' that they are *per se* illegal.") (citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)); *United States v. Vega-Martínez*, 949 F.3d 43, 52 (1st Cir. 2020) (upholding defendants convictions for conspiring to rig bids and allocate markets, "both per se violations of the Sherman Act."); *see N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) ("Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing [and] division of markets . . . ." (internal citations omitted)).

Where the *per se* rule applies, the government need only prove that the defendant knowingly conspired to engage in the conduct—e.g., fixing prices or allocating markets—that courts recognize as *per se* unlawful. The government need not prove that the agreement was factually unreasonable. *United States v. Peake*, 804 F.3d 81, 93 n.10 (1st Cir. 2015) ("A *per se* Section 1 violation is not excused by a showing that the supra-competitive prices were somehow still reasonable.") (citing *Socony–Vacuum*, 310 U.S. at 212–13); *see also United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972) ("[N]aked restraints of trade are [not] to be tolerated because they are well intended or because they are allegedly developed to increase competition."); *Vega-Martínez*, 949 F.3d at 52 (upholding defendants *per se* Sherman Act conviction and

affirming the district court's determination that a *per se* violation did "did not require the jury to assess [the conspiracy's] supposed reasonableness").

Defendants fault the Indictment for failing to allege an overt act, Def. Mot. at 2, or that the Defendants "actually fixed wages." *Id.* at 13. These arguments ignore the fact that Section 1 of the Sherman Act makes the *agreement* in restraint of trade the crime. *Socony-Vacuum*, 310 U.S. at 224 n.59 (emphasis added) ("it is . . . well settled that conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring."); *United States v. Kissel*, 218 U.S. 601, 607 (1910) (holding that the crime "exists as soon as the agreement is made . . . the unlawful agreement satisfies the definition of the crime."); *see Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991) ("the essence of any violation of § 1 is the illegal agreement itself-rather than the overt acts performed in furtherance of it") (internal citations omitted); *see Vega-Martinez*, 949 F.3d at 52 (holding it was "well within" the trial court's discretion to exclude evidence that the defendants' Sherman Act conspiracy didn't cause any harm); *United States v. Koppers Co.*, 652 F.2d 290, 295 n.6 (2d Cir. 1981) ("[T]he per se rule makes certain conspiracies illegal without regard to their actual effects on trade. . . ."). Accordingly, in "cases involving behavior such as bid rigging, which has been classified by courts as a per se violation, the Sherman Act will be read as simply saying: 'An agreement among competitors to rig bids is illegal.'" *Id.* at 294 (quoting *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979)).

Thus, in *per se* cases, the question for the jury—in either a criminal or civil antitrust case—is simply whether the *per se* unlawful agreement, that is, the unreasonable agreement in restraint of trade, occurred. *Id.* at 294 (quoting Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* 18 (1978)); *see also In re Cox Enters., Inc.*, 871 F.3d 1093, 1097 (10th Cir. 2017)

("Under a *per se* rule, plaintiffs prevail simply by proving that a particular contract or business arrangement . . . exists").

### A. Defendants' wage-fixing and worker-allocation conspiracy constitutes a *per se* Section 1 violation.

The Indictment alleges that Defendants "agreed to fix the hourly rates for PSS workers," a *per se* violation of 15 U.S.C. §1. Indictment at ¶ 17(d). Wage fixing is price fixing. *Anderson*, 272 U.S. at 361-65; *see Alston*, 141 S. Ct. at 2167 (Kavanaugh, J., concurring) ("Price-fixing labor is price-fixing labor."). Applying *Anderson*, courts in both criminal and civil cases have continued to condemn wage-fixing agreements as *per se* illegal. *See, e.g.*, *United States v. Jindal*, No. 4:20-cr-00358, 2021 WL 5578687, at *7, *18 (E.D. Tex. Nov. 29, 2021) (denying motion to dismiss an indictment charging the defendants with a *per se* Section 1 Sherman Act violation for entering into an agreement to fix wages, reasoning that "price-fixing agreements—even among buyers in the labor market—have been per se illegal for years."); *Doe v. Arizona Hosp. & Healthcare Ass'n*, No. 07-1292, 2009 WL 1423378, at *2-4 (D. Ariz. Mar. 19, 2009) (holding that fixing wages of temporary nurses is *per se* unlawful price fixing); *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 624 (E.D. Mich. 2012) ("[A] conspiracy among competing hospitals to fix wages, like an analogous horizontal price-fixing conspiracy, would be subject to *per se* treatment."); *Cordova v. Bache & Co.*, 321 F. Supp. 600, 608 (S.D.N.Y. 1970) ("[N]o authority supports the proposition that a group of employers may jointly agree upon the wages to be paid to their respective employees.").

Likewise, the Indictment's allegation that Defendants agreed "not to hire each other's PSS workers" also pleads a *per se* violation. Indictment at ¶15. When competitors conspire to not hire one another's employees, they are engaging in *per se* illegal market allocation. *Markson v. CRST Int'l, Inc.*, No. 17-01261, 2021 WL 1156863, at *4 (C.D. Cal. Feb. 10, 2021); *In re Ry. Indus.*

*Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 480–85 (W.D. Pa. 2019); *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1211–14 (N.D. Cal. 2015); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038–39 (N.D. Cal. 2013); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1110–12, 1122 (N.D. Cal. 2012); *see also Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1110 n.4 (9th Cir. 2021) (citation omitted) (without deciding issue, finding "considerable merit" in treating naked nonsolicitation agreements as *per se* unlawful); *In re Geisinger Health & Evangelical Cmty. Hosp. Healthcare Workers Antitrust Litig.*, No. 21-00196, 2021 WL 5330783, at *2–4 (M.D. Pa. Nov. 16, 2021) (denying motion to dismiss *per se* claim based on no-poach agreement); Areeda & Hovenkamp, *supra*, ¶ 2013a ("'Anti-poaching' agreements . . . operate as market-division agreements" that, "[a]s a general proposition, . . . are illegal per se" if naked and not otherwise immunized.).

Indeed, courts have long recognized that, outside the context of sports leagues and other ventures where certain restraints are necessary to create a new product, it is "*per se* illegal" for "employers who compete for labor" to "agree among themselves to purchase that labor only on certain specified terms and conditions." *NBA v. Williams*, 45 F.3d 684, 687 (2d Cir. 1995). Employer cartels are thus no different than any other *per se* unlawful buyer-side cartel, and they should be treated as such under Section 1. *See Mandeville*, 334 U.S. at 235-36 (holding that alleged conspiracy would violate Section 1 "even though the price-fixing was by purchasers"); *see In re Ry. Indus. Emp.*, 395 F. Supp. 3d at 481 ("Antitrust law does not treat employment markets differently from other markets."); *cf. United States v. DaVita, Inc.*, No. 21-00229, Order Denying Defendants' Motion to Dismiss, Doc. 132 (D. Colo. Jan. 28, 2022) (finding that indictment alleging a "no-poach" conspiracy was properly categorized as *per se* labor market allocation: "[t]here is less precedent on *per se* treatment of horizontal market allocation agreements allocating

employment markets, but that makes no difference. Even if there were no such history, anticompetitive practices in the labor market are equally pernicious—and are treated the same— as anticompetitive practices in markets for goods and services.").

### B. Defendants offer no reason for creating a new exception to the *per se* rule for the charged wage-fixing and worker allocation conspiracy.

The *per se* rule applies here because Defendants' conduct falls within the category of restraints long condemned as inherently anticompetitive. By agreeing to fix wages and not compete for one another's PSS workers, Defendants formed a buyer-side cartel to suppress wage competition and allocate the labor market. The illegality of that conspiracy under the Sherman Act is clear, regardless of Defendants' industry or their status as employers. *See Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 349-51 (1982) (citing *Socony-Vacuum*, 310 U.S. at 222).

The Court should reject Defendants' proposed exception to the *per se* rule against horizontal price-fixing and market-allocation agreements. Defendants insist that courts have not had "sufficient experience" with wage-fixing and worker-allocation agreements to conclude that they are *per se* unlawful, particularly "with personal care services among the immigrant community during a pandemic." Def. Mot. at 24. In Defendants' view, this lack of "judicial experience" is fatal. *See Id.*

Defendants misapprehend the role of "judicial experience" in the *per se* rule's application. Judicial experience informs a court's decision to recognize "a <u>new</u> *per se* rule" *Maricopa County*, 457 U.S. at 349 n.19 (emphasis added). But deciding whether a particular horizontal restraint should be treated the same as other horizontal restraints already subject to the *per se* rule depends on whether such "conduct falls squarely into a category of economic restraint necessarily prohibited by Section 1. . . ." *United States v. Joyce*, 895 F.3d 673, 677-78 (9th Cir. 2018) (applying *per se* rule to bid rigging at foreclosure auctions as "a form of horizontal price fixing"). That is

why the *per se* rule applies to horizontal restraints even if not "precisely identical" to those that "appear in the case law as a *per se* violation*." Andreas*, 216 F.3d at 666-67 ("[T]he fact that the lysine producers' scheme did not fit precisely the characterization of a prototypical *per se* practice does not remove it from *per se* treatment."); *cf. California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134-37 (9th Cir. 2011) (en banc) (suggesting that the *per se* rule applies where a restraint can "sensibly be grouped together with or analogized to" those previously found to be "per se illegal").

A restraint that is "tantamount to" *per se* unlawful conduct "falls squarely within the traditional *per se* rule. . . ." *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648-49 (1980). The Court adhered to this principle in *Maricopa County* in applying the *per se* rule to agreements among physicians to set maximum reimbursement fees. 457 U.S. at 347-49. There, the lower court believed it did not have enough experience with the health-care practices at issue to apply the *per se* rule. *Id.* at 337-38; *see Arizona v. Maricopa Cnty, Med. Soc.*, 643 F.2d 553, 559-60 (9th Cir. 1980). The Supreme Court reversed. The Court held that the *per se* rule need not "be rejustified for every industry that has not been subject to significant antitrust litigation," and that, in any event, "[h]orizontal agreements to fix maximum prices" stand "on the same legal—even if not economic—footing as agreements to fix minimum or uniform prices." *Maricopa County*, 457 U.S. at 348-51. The Court concluded therefore that, regardless of any asserted "procompetitive justifications," agreements to set maximum prices "fit squarely into the horizontal price-fixing mold." *Id.* at 351, 357.[2]

---

[2] Defendants propose a nonsensically narrow definition of "judicial experience," unmoored from the caselaw. According to Defendants, a court could not condemn a price-fixing conspiracy as *per se* unlawful unless the court had already encountered the specific industry (in this case, the personal care services industry) situated in the specific community (the immigrant community) at the specific moment (during a pandemic). Def. Mot. at 24. Such a rule would effectively eliminate the *per se* rule because courts could apply it only in the precise industry and social and economic circumstances previously encountered. Defendants proposed interpretation of "judicial experience" defies both common sense and the preceding case law.

The question, then, is whether Defendants' horizontal wage-fixing and worker-allocation conspiracy, as charged in the Indictment, is tantamount to a restraint that falls within a category of *per se* illegal conduct. The answer to that question is clearly yes, as the cases cited *supra* demonstrate. Wage fixing is tantamount to price fixing, *Anderson*, 272 U.S. at 361-65, and naked horizontal no-hire agreements among employers is tantamount to market allocation. *Id.*; *see Jindal*, 2021 WL 5578687, at *7 (rejecting defendants' argument that there is insufficient judicial experience to condemn wage fixing as *per se* illegal, because "price-fixing agreements—even among buyers in the labor market—have been per se illegal for years."); *DaVita,* No. 21-00229, Order Denying Defendants' Motion to Dismiss, Doc. 132 (rejecting defendants similar "judicial experience" argument and finding that "if naked non-solicitation agreements or no-hire agreements allocate the market, they are *per se* unreasonable."); *see, e.g.,* Areeda & Hovenkamp, *supra*, ¶352c ("Just as antitrust law seeks to preserve the free market opportunities of buyers and sellers of goods, so also it seeks to do the same for buyers and sellers of employment services.").[3]

## C. None of the cases cited by Defendants displace application of the *per se* rule to the charged conspiracy.

Defendants rely on dicta in a recent Supreme Court decision, *National Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021), to challenge decades of established antitrust doctrine.

---

[3] In the context of Section 6 of the Clayton Act, 15 U.S.C. § 17, the First Circuit has held that labor market restraints are outside the scope of the antitrust laws. *Carroll v. Prot. Maritime Ins. Co.*, 512 F.2d 4, 6 (1st Cir. 1975). The court's analysis was based specifically on the first sentence of Section 6 of the Clayton Act, and the court explained, every other court considering the scope of Section 6 has held it does not exempt agreements among employers (only employees). *See Cordova*, 321 F. Supp. at 606; *see also Mackey*, 543 F.2d 606, 617 & n.22 (8th Cir. 1976) (following *Cordova*); *Quinonez v. Nat'l Ass'n of Sec. Dealers*, 540 F.2d 824, 828-29 & n.9 (5th Cir. 1976) (same); *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332, 335-36 (7th Cir. 1967) (same); *cf. Md. and Va. Milk Producers Ass'n, Inc. v. United States*, 362 U.S. 458, 465 (1960) ("[T]he full effect of § 6 is that a group of farmers [or laborers] acting together as a single entity in an association cannot be restrained 'from lawfully carrying out the legitimate objects thereof'"). (citation omitted). Along with Section 20 of the Clayton Act, 29 U.S.C. § 52, and the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105, 113, Section 6 forms the basis of the statutory exemption from the antitrust laws for labor unions. *See Connell Constr. Co., v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 622 (1975). The statutory exemption is limited to "bona fide labor organization[s]," *H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 717 & n. 20 (1981), and is not applicable here. In any event, because Defendants failed to argue in their motion that *Carroll* is applicable here, that argument is waived.

They cite *Alston* to argue that, because in rule-of-reason cases the element of unreasonableness is a question of fact, it should also be analyzed as a question of fact in a *per se* case. Their argument ignores the fundamental principle that *per se* conduct is, by definition, an unreasonable restraint of trade. As *Alston* recognized, "some agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful *per se*." *Id.*, 141 S. Ct. at 2156 (citing *Dagher*, 547 U.S. at 7 n.3).

Further, the plaintiffs in *Alston* did not seek *per se* condemnation, and the Court reaffirmed that the NCAA's rules were not "*per se* unlawful only because they arose in 'an industry' in which some 'horizontal restraints on competition are essential if the product is to be available at all.'" *Id.* at 2157 (quoting *NCAA v. Bd. of Regents*, 468 U.S. 85, 101 (1984)). As the Court explained, in the context of a sports league, "the very competitions that consumers value would not be possible" absent "some agreement among rivals." *Id.* at 2156. Nothing of the sort can be gleaned from the indictment, and tellingly, Defendants do not attempt to make such an argument.

*Alston* thus does not shield horizontal wage fixing and worker allocation from the *per se* rule. Far from it. Rather, *Alston* reaffirms that the *per se* rule condemns horizontal restraints that "obviously threaten to reduce output and raise prices," *id.*, and that the same antitrust rules govern both sellers' and buyers' markets—including labor markets. *Id.* at 2154-57 (reasoning that "fixing wages" falls "on the far side of" the anticompetitive "line," not "the great in-between"). Moreover, the precedents undergirding *Alston* confirm that regardless of the market "[t]he same legal standard (*per se* unlawfulness) applies to horizontal market division and horizontal price fixing because both have similar economic effect." *Leegin*, 551 U.S. at 904; see *Verizon v. Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (identifying "collusion" as "the supreme evil of antitrust"); *Mandeville*, 334 U.S. at 235 (prohibiting buyer cartels). Hence, because Defendants' wage-fixing and worker-

allocation conspiracy stands on the same footing as a naked horizontal price-fixing and market-allocation restraint, *Alston* provides no support for applying the rule of reason in this case.

Nor can Defendants draw support from the two post-*Alston* district court orders they selectively quote from. Def. Mot. at 23-24. Unlike here, both of those cases concerned no-hire provisions in franchise agreements, and neither addressed *Alston*'s applicability outside of that context. *Conrad v. Jimmy John's Franchise, LLC*, No. 18-00133, 2021 WL 3268339, at *10 (S.D. Ill. July 30, 2021); *DeSlandes v. McDonald's USA, LLC*, No. 17-4857, 2021 WL 3187668 (N.D. Ill. July 28, 2021). In fact, the district court in *DeSlandes* reiterated that, "[A] no-hire agreement is, in essence, an agreement to divide a market, [so] the Court has no trouble concluding that a naked horizontal no-hire agreement would be a *per se* violation of the antitrust laws."[4] 2021 WL 3187668, at *5. Neither case bolsters Defendants' apparent theory that Alston tacitly upended the *per se* rule's settled application to naked buyer-side cartels. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*").

*Gypsum* does not help Defendants either. That case did not involve a *per se* violation of the Sherman Act. *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978). In *Gypsum*, the Court held that "the criminal offenses defined by the Sherman Act should be construed as including intent as an element." 438 U.S. at 443. *Gypsum* expressly limited the standard requiring "that the defendant's conduct was undertaken with knowledge of its probable consequences" to "cases where anticompetitive effects have been demonstrated" – that is to say, rule-of-reason cases. *Id.* at

---

[4] The court in *DeSlandes* went even further and provided an illustrative example to explain why naked conspiracies to allocate employees are subject to *per se* treatment. "Even a person with a rudimentary understanding of economics would understand that if, say, large law firms in Chicago got together and decided not to hire each other's associates, the market price for mid-level associates would stagnate. With no competition for their talent (aside from lower-paying in-house or government jobs), associates would have no choice but to accept the salary set by their firms or to move to another city. Thus, such a claim would be suitable for *per se* treatment." 2021 WL 3187668, at *5.

444 n.21. The Court then went even and further and distinguished "conduct regarded as *per se* illegal because of its unquestionably anticompetitive effects," from the conduct at issue. *Id.* at 440 (citing *Socony-Vacuum*, 310 U.S. 150). Nothing in *Gypsum* can be construed as requiring a showing of anti-competitive effects in *per se* cases.

Defendants nevertheless rely on *Gypsum* to ask this Court to invent a new "overt act" or "anticompetitive effect" element of a *per se* Sherman Act violation, which would contravene Supreme Court and First Circuit precedent, including *Gypsum* itself. The government need not prove either an overt act or anti-competitive effects under the *per se* rule. *Socony-Vacuum*, 310 U.S. at 224 n.59 (Finding that "[w]hatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness," and adding "it is . . . well settled that conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring."); *Kissel*, 218 U.S. at 607 (1910) (holding that the crime "exists as soon as the agreement is made . . . the unlawful agreement satisfies the definition of the crime."); *see also, e.g., Vega-Martinez*, 949 F.3d at 52 (1st Cir. 2020) ("Determining the defendants' liability for [*per se* illegal] conduct did not require the jury to assess its supposed reasonableness.").

Finally, Defendants misleadingly quote *State Oil Co. v. Khan*, 522 U.S. 3 (1997), to argue that, contrary to decades of precedent, the "'fact finder must decide whether the questioned practice imposes an unreasonable restraint on competition' so as to trigger the per se rule." Def. Mot. at 8. The court in *Khan*, however, did not hold that the finder of fact must determine whether to "trigger" the *per se* rule. Rather, *Khan* expressly found that only where "antitrust claims are analyzed under a 'rule of reason'" does "the finder of fact [] decide whether the questioned practice imposes an unreasonable restraint on competition." *Khan*, 522 U.S. at 10. The court in *Khan* further

acknowledged that "[s]ome types of restraints, however, have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *Id.*

### D. Defendants' ancillary-restraints argument lacks merit.

Defendants likewise cannot evade the *per se* rule by arguing that their conspiracy was "ancillary" to a legitimate, procompetitive collaboration. They have failed to identify allegations in the Indictment indicating that the Defendants themselves carried out a legitimate and procompetitive business transaction or venture to which their wage-fixing and worker-allocation conspiracy could be "ancillary." Indeed, nothing of the sort can be gleaned from the face of the Indictment. What's more, by asserting an "ancillary restraint" defense in a motion to dismiss, Defendants are improperly asking the court to consider facts beyond the Indictment itself. As a result, their arguments must fail.

Restraints normally subject to the *per se* rule may nevertheless be subject to the rule of reason if the challenged restraint is ancillary to an existing business agreement. To assert an "ancillary restraint" defense, Defendants must show that their conspiracy was (1) "subordinate and collateral to a separate, legitimate transaction"; and (2) "'reasonably necessary' to achieving that transaction's pro-competitive purpose." *Aya*, 9 F.4th at 1109; *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898) aff'd as modified in other part, 175 U.S. 211 (1899); *see, e.g., Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188 (7th Cir. 1985). Common examples include the sale of a business with a temporary noncompete covenant, *id.*, or an agreement among the partners of a law firm not to compete with the firm. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 n.10 (D.C. Cir. 1986) (Bork, J.). Both agreements are horizontal restraints among potential rivals not to compete. *Polk Bros.*, 776 F.2d

at 187-90 (Easterbrook, J.). But under the ancillary-restraints doctrine, such agreements are subordinate and collateral to procompetitive endeavors in the sense that they are "related to the efficiency sought to be achieved" and can "make the main transaction more effective." *Rothery*, 792 F.2d at 224; *Addyston*, 85 F. at 290-91 (requiring "commensurate" restraints).

Defendants have identified neither a "separate, legitimate transaction" that their conspiracy is supposedly "subordinate and collateral" to, nor have they asserted why such a conspiracy would be "'reasonably necessary' to achiev[e such a] transaction's pro-competitive purpose." *Aya*, F.4th at 1109. Nor could they. Neither of those fact-intensive elements can be discerned from the Indictment, which plainly charges a naked horizontal conspiracy with no procompetitive venture and no subordinate, collateral, or reasonably-necessary restraint. Defendants' contrary assertions are based on inappropriate offers of proof that stray far beyond the face of the Indictment and must be rejected.[5]

## II.    The *per se* rule is an interpretation of the Sherman Act, not an evidentiary presumption.

Defendants challenge to the *per se* rule as an unconstitutional evidentiary presumption is foreclosed by long-standing Supreme Court and Circuit Court precedent.

The applicability of the *per se* rule is a legal question for the Court. Although courts in civil cases have sometimes described the *per se* rule as a "conclusive presumption that [a] restraint is unreasonable," *Maricopa Cnty.*, 457 U.S. at 344, no authority supports Defendants' claim that the *per se* rule is an evidentiary presumption—much less an evidentiary presumption that "reliev[es] the State of its burden of persuasion beyond a reasonable doubt of every essential

---

[5] If Defendants intend to raise such a defense, it will require a factual showing that may not be determined on a motion to dismiss. *See e.g.*, *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1150-54 (9th Cir. 2003) (ancillary doctrine described as "defense"); *United States v. Gaines*, No. 20-cr-20, 2020 WL 5215386, at *4 (D. Minn. Aug. 4, 2020), report and recommendation adopted, 2020 WL 5204284 (D. Minn. Sept. 1, 2020) (stating that "[t]he ancillary restraints doctrine provides a limited defense to an otherwise per se illegal restraint" and rejecting its consideration on a motion to dismiss).

element of a crime," *see Francis v. Franklin*, 471 U.S. 307, 313 (1985). As the Supreme Court has stated, the *per se* rule does not change what is required to prove a crime; it is instead an "interpretation[] of the Sherman Act" that categorically prohibits certain types of conduct. *FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 432-433 (1990). Indeed, the *per se* rule is "a statutory command" of Section 1 that is "analogous to *per se* restrictions upon, for example, stunt flying in congested areas." *Id.* at 432-433 (citation and internal quotation marks omitted). Even if some "violations of such rules actually cause no harm," the rules are warranted nevertheless because "every stunt pilot poses some threat to the community." *Id.* at 433-434. "So it is with . . . price fixing" and other *per se* unlawful conduct, all of which threatens "the central nervous system of the economy." *Id.* at 434-45 (citation omitted).

The Supreme Court has consistently applied the *per se* rule to criminal prosecutions under the Sherman Act. In *United States v. Trenton Potteries,* it affirmed a district court's jury instruction that permitted the jury to find guilt "without regard to the reasonableness of the prices fixed." 273 U.S. 392, 395 (1927) (holding that the district court "correctly withdrew from the jury the consideration of the reasonableness of the particular restraints charged" because "[w]hether the prices actually agreed upon were reasonable or unreasonable was immaterial."). The Supreme Court further emphasized that the "aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition," and that it has "always [been] assumed that uniform price-fixing by those controlling in any substantial manner a trade or business in interstate commerce is prohibited by the Sherman [Act], despite the reasonableness of the particular prices agreed upon." *Id.* at 397, 398.

The Supreme Court took the same approach to the criminal prosecution of a price-fixing conspiracy in *Socony-Vacuum*, holding that the jury could find guilt "if [the alleged] illegal

combination existed," regardless of "how reasonable or unreasonable" it might be. 310 U.S. at 210. To support its decision, the Court found that "it would *per se* constitute" such an unlawful "restraint if price-fixing were involved," and no reasonableness instruction was therefore required. *Id.* at 216. The Court explained that "for over forty years [it] has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act." *Id.* at 218; *see id.* at 212 (internal citations omitted). "Whatever economic justification particular price-fixing agreements may be thought to have," the Court added, "the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." *Id.* at 224 n.59; *see id.* at 221 (explaining that having "reasonableness" as "an issue in every price-fixing case" would be anathema to the Sherman Act).

As those decisions illustrate, instructing a jury that it may find a defendant guilty of violating Section 1 based on a finding that he entered into a price-fixing agreement—without a separate inquiry into whether the agreement was reasonable—does not "deny a jury decision as to an element of the crime." *United States v. Manufacturers' Ass'n of the Relocatable Bldg. Indus.*, 462 F.2d 49, 52 (9th Cir. 1972). It instead reflects the basic principle that juries resolve questions of fact, and "any agreement for price-fixing, if found, [is] illegal as a matter of law." *Trenton Potteries*, 273 U.S. at 400; *see, e.g., Cline v. Frink Dairy Co.*, 274 U.S. 445, 461 (1927) (explaining that, at common law, the "reasonableness" of price-fixing agreements was not "left to the . . . jury"); *Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211, 238 (1899) (similar).

Recognizing over a century of binding Supreme Court precedent, all the courts of appeals that have considered Defendants' precise argument have rejected it. *See United States v. Sanchez*, 760 F. App'x 533, 535 (9th Cir. 2019), cert. denied, 140 S. Ct. 909 (2020) ("Defendants' argument that *Manufacturers'* is clearly irreconcilable with intervening Supreme Court decisions relating to

mandatory evidentiary presumptions in criminal law is irrelevant, because *Manufacturers'* held that the per se rule is not an evidentiary presumption at all.") (emphasis omitted); *United States v. Giordano*, 261 F.3d 1134, 1143-44 (11th Cir. 2001) ("Appellants' argument in effects asks us to overrule *Socony-Vacuum*. Like other circuits that have been asked to overrule *Socony-Vacuum*, we decline to do so."); *Koppers*, 652 F.2d at 293 ("This argument asks us in effect to overrule the Supreme Court's decisions in *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150 (1940), and in *United States v. Topco Associates, Inc.,* 405 U.S. 596 (1972). We decline the invitation . . . ."); *Manufacturers'*, 462 F.2d at 50 ("Appellants' contention that the per se rule constitutes an unconstitutional conclusive presumption misunderstands the Sherman Act."); *Cargo Serv. Stations*, 657 F.2d at 683-84 (recognizing binding precedent and finding that *per se* rule did not deny due process); *Brighton Bldg. & Maint.*, 598 F.2d at 1106 (recognizing binding precedent); *United States v. Fischbach & Moore, Inc.,* 750 F.2d 1183, 1195-96 (3d Cir. 1984) (same).

### III. The Sherman Act as construed by the courts provides the notice required by due process.

Finally, Defendants allege that the Sherman Act as alleged in the Indictment is "void for vagueness" and allege that it does not provide the "fair warning" that due process requires to indict them. Def. Mot. at 26-27. Not so. Defendants received all the process they were due in being charged with conspiracy to fix wages and allocate workers.

Due process requires that "the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997); *see also id*. at 266 (judicial decisions may supplement statutory text and provide "clarity at the requisite level" through "judicial gloss."). This means that the statute must "define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and

discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358, 402-03 (2010) (internal quotation marks and alterations omitted). A criminal statute need not delineate all of its potential applications; "no more than a reasonable degree of certainty can be demanded." *Boyce Motor Lines*, 342 U.S. at 340. Further, as another district court recently observed in rejecting a vagueness challenge to a market-allocation charge under the Sherman Act, "vagueness standards are not as stringent 'where the statute is directed only at conduct designed to destroy competition, activity which is neither constitutionally protected nor socially desirable.'" *United States v. Harwin*, No. 2:20-cr-00115, 2021 WL 719614, at *7 (M.D. Fla. Feb. 24, 2021) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 36 (1963)).

Defendants baldly assert, without supporting authority or even much argument, that Section 1, as applied in this case, is "void for vagueness" and "does not adequately provide notice" of "what conduct is permitted and what conduct is proscribed."[6] Def. Mot. at 27-28. Defendants wholly fail to acknowledge that price-fixing labor and allocating markets have long been *per se* illegal under the Sherman Act. Price-fixing has been *per se* illegal for over a century. *See Standard Oil Co. v. United States*, 221 U.S. 1 (1911); *Trenton Potteries*, 273 U.S. 392; *Socony–Vacuum*, 310 U.S. 150. And wage-fixing specifically has been understood to be price-fixing for nearly as long. *Anderson*, 272 U.S. at 361-65 (1926). Likewise, horizontal market allocation has been *per*

---

[6] To the extent Defendants are making a facial vagueness challenge to Section 1 of the Sherman Act, their challenge is foreclosed by *Nash v. United States*, which held that "there is no constitutional difficulty in the way of enforcing the criminal part of the [Sherman Act]." 229 U.S. 373, 378 (1913). Like here, the defendants in *Nash* unsuccessfully challenged their indictments for various antitrust violations on the ground that the Sherman Act's prohibition of unreasonable restraints of trade was too vague a standard to support criminal prosecution. *Id.* at 376-77. The Court rejected that argument, explaining that "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." *Id.* at 377. Defendants' facial challenge, then, must fail. As another district court recently observed: "No court has found section one of the Sherman Act unconstitutionally void for vagueness, and it is noteworthy that the only vagueness challenge to section one of the Sherman Act that made it to the Supreme Court was rejected." *Harwin*, 2021 WL 719614, at *7 (citing *Nash*, 229 U.S. at 378).

*se* illegal since 1899, *Addyston*, 175 U.S. at 241-42, and worker-allocation restraints had been recognized to be subject to the same rule well before Defendants' conspiracy began in 2020. Phillip Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 2013b (3d ed. 2007) (categorizing "no-poach" restraints as "generally unlawful *per se*"). Defendants' assertions that they were deprived of due process lack merit and should be rejected.

## CONCLUSION

Defendants' arguments in support of their motion to dismiss lack merit, and their motion should be denied.

Respectfully submitted,

*/s/ Nolan J. Mayther*
EYITAYO ST. MATTHEW-DANIEL
Assistant Chief, New York Office
Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Suite 3600
New York, NY 10278
Tel: 202-677-0370
Email: Eyitayo.st.matthew-daniel@usdoj.gov

NOLAN J. MAYTHER
Trial Attorney, San Francisco Office
Antitrust Division
U.S. Department of Justice

PHILIP D. ANDRIOLE
Trial Attorney, New York Office
Antitrust Division
U.S. Department of Justice

**CERTIFICATE OF SERVICE**

This is to certify that on June 21, 2022, the undersigned caused to be electronically filed the foregoing United States' Opposition to Defendants' Motion to Dismiss the Indictment (ECF No. 79) with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

*/s/ Nolan J. Mayther*
NOLAN J. MAYTHER
Trial Attorney
United States Department of Justice
Antitrust Division